J-S04045-16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  ADOPTION OF B.M.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  M.L.D., MOTHER | : | No.  1227 WDA 2015 |

Appeal from the Order Entered July 8, 2015,
in the Court of Common Pleas of Westmoreland County,
Orphans' Court, at No(s): No. 17 of 2015

| | | |
|---|---|---|
| IN RE:  ADOPTION OF S.T.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  M.L.D., MOTHER | : | No.  1228 WDA 2015 |

Appeal from the Order July 8, 2015,
in the Court of Common Pleas of Westmoreland County,
Orphans' Court, at No(s): No. 16 of 2015

BEFORE:    BOWES, OLSON, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J:        FILED: February 9, 2016

M.L.D. (Mother) appeals from the orders entered July 8, 2015, which terminated involuntarily her parental rights to her minor children, B.M.G. and S.T.G. (collectively, Children).[1]  We affirm.

The orphans' court summarized the background underlying this matter as follows.

> [Mother is the natural mother of Children.[2]  S.T.G. was born in February 2006 and B.M.G. was born in November 2002. Children have been in placement since May 2013, when the Westmoreland County Children's Bureau (the Agency) took

---

[1] This Court *sua sponte* consolidated Mother's appeals at 1227 WDA 2015 and 1228 WDA 2015 by order dated August 28, 2015.

[2] P.G., the birth father of Children, passed away prior to their dependency.

*Retired Senior Judge assigned to the Superior Court.

emergency custody of Children, and they are currently placed in a pre-adoptive foster home.

By way of further background, a] dependency petition was filed on May 8, 2013 based on the excessive history that the [A]gency had with the family and the knowledge that Mother was not able to care for [C]hildren and ensure their safety. [Anthony Berarducci, the Agency caseworker, testified that there were a total of nineteen referrals made regarding Children.] The main concern at the time of dependency involved Mother's addiction and excessive use of alcohol. [C]hildren were already privately placed by Mother, as she was incarcerated at the time, and the family they were placed with could not continue to care for [C]hildren. This was not the first private placement made by Mother. She placed [C]hildren with family and friends multiple times due to incarcerations, hospitalizations, and lack of appropriate housing. Three months prior to the dependency, [C]hildren were residing with family in Arizona for a period of four months.

[C]hildren were adjudicated dependent on May 28, 2013 and were placed in foster care. At that time, Mother was ordered to complete inpatient drug and alcohol treatment or outpatient treatment until successful discharge, to participate in random drug screens, to participate in a mental health evaluation, to obtain and maintain stable and appropriate housing, and to obtain a source of income. Permanency [r]eview hearings were held on August 22, 2013, November 25, 2013, February 27, 2014, May 8, 2014, August 28, 2014, and December 2, 2014 to determine Mother's compliance with the permanency plan and Mother's progress in alleviating the circumstances that led to placement.

Unfortunately, Mother consistently demonstrated a lack of compliance and a lack of progress throughout the review period. At the August 22, 2013, November 25, 2013, and February 27, 2014 permanency review hearings, Mother was only in minimal compliance with the permanency plan and had made only minimal progress in alleviating the circumstances that led to placement. Although Mother did obtain a drug and alcohol evaluation, she did not successfully continue with recommended treatment. She failed to obtain employment, only obtained a one bedroom apartment that was not appropriate for [C]hildren,

and did not consistently participate in random drug screens. Her visitations remained consistent with [C]hildren except during a two month hospitalization and a week in jail on a theft charge.

By the time of the May 8, 2014 permanency review period, Mother's compliance with the permanency plan increased to moderate compliance. At that point, Mother was attending drug and alcohol treatment and mental health treatment. However, she still had pending criminal charges, a lack of income, and drug and alcohol issues.

Mother's increase in her compliance with the permanency plan did not last until the next permanency review hearing. Also, her progress in alleviating the circumstances that led to placement decreased from minimal progress to no progress at all. This remained true throughout the permanency review hearings held on August 28, 2014 and December 2, 2014. Mother lost the housing that she did have due to an eviction, she was involuntarily committed for mental health, and she was testing positive for alcohol. At this point, some of the visitations with [C]hildren had to be canceled due to Mother's alcohol use.

Based on the substantial decline of Mother's compliance with the permanency plan and progress in alleviating the circumstances that led to placement, the [A]gency filed a Petition to Involuntarily Terminate Parental Rights on February 18, 2015 against Mother in relation to [C]hildren. A hearing on the termination petition against Mother was held on July 2, 2015. Mother appeared at the hearing and was represented. After a review of the testimony and evidence presented, [the orphans' c]ourt entered an Order dated July 8, 2015 terminating Mother's parental rights to [C]hildren. [This appeal followed.]

Orphans' Court Opinion, 9/1/2015, at 1-4 (footnote omitted).

On appeal, Mother raises one issue for our consideration: "Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden under 23 Pa.C.S. §[]2511(b) that the best

interests of [C]hildren are met by terminating Mother's parental rights?"

Mother's Brief at 4.

We consider Mother's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention

- 4 -

paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to subsections 2511(a)(2), (a)(5), (a)(8), and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date

of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).

Instantly, Mother does not dispute that the Agency presented clear and convincing evidence that her parental rights should be terminated pursuant to subsection 2511(a). Thus, we need only consider whether the court properly terminated Mother's parental rights pursuant to subsection 2511(b). We have discussed our analysis under subsection 2511(b) as follows.

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id**. However, in cases where there is no evidence of a

bond between a parent and child, it is reasonable to infer that no bond exists. ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. ***Id***. at 763.

***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa. Super. 2010).

The orphans' court concluded that terminating Mother's parental rights would best serve the needs and welfare of Children. In so doing, the court reasoned as follows:

> Based on the testimony presented, it is clear that [C]hildren's needs and welfare are best satisfied in their current placement with the foster parents. There is no stability for [C]hildren if Mother's parental rights are maintained. In the two years that [C]hildren have been in placement, Mother has failed to fulfill the hopes of [C]hildren in her recovery and her ability to provide them with the essential care that they need. [C]hildren's best interests are certainly not served by allowing the instability and inconsistency of Mother's parenting to continue. The "court may properly terminate parental bonds which exist in form but not substance when preservation of the parental bond would consign the child to an indefinite, unhappy, and unstable future devoid of the irreducible minimum parental care to which the child is entitled." ***In re Diaz***, 669 A.2d 372, 377 (Pa. Super[.] 1995). It is clear in this case that maintaining the minimal bond between [C]hildren and Mother would only result in a continued lack of stability and an indefinite future for [C]hildren. The needs and welfare of [C]hildren have been in a state of flux for a period of two years. [C]hildren deserve to know that they have a stable home and that they can establish relationships in that home and in the community around them. Therefore, this [c]ourt did not err in determining that the needs and welfare of [C]hildren are best protected by termination of Mother's parental rights pursuant to [subs]ection 2511(b).

Orphans' Court Opinion, 9/1/2015, at 16-17.

Mother argues termination was improper because, though minimal, there was a bond between Mother and Children. Mother's Brief at 8-9. Mother further claims that there was no bond between the foster parents and Children, as a bond was only beginning to develop. *Id.* Mother also contends that testimony from the termination hearing indicated that Children should be placed together, and B.M.G. was having difficulty deciding whether he wanted to be adopted. *Id.* at 8.

After a thorough review of the record in this matter, we conclude that the orphans' court properly terminated Mother's parental rights to Children under subsection 2511(b). During the termination hearing, Psychologist Carol Patterson provided expert testimony regarding the bond between Children and Mother. In performing her evaluation, she conducted an interview with Children, observed Children with their Mother and their foster parents, and saw Mother and the foster parents without Children. N.T., 7/2/2015, at 6. Based on her observations, Ms. Patterson judged the bond between Children and Mother as "very minimal," explaining that

> [B.M.G.] did not initiate any affectionate behavior toward [Mother], [S.T.G.] only initiated one affectionate behavior even though they had not seen [Mother] since January. They had mostly negative responses to [M]other's approaches towards them. They had minimal conversation with [M]other. [B.M.G.] acted out on one occasion. And then when I interviewed them, also, it was clear that they had given permanency a great deal of thought and both were expressing a desire to be adopted.

*Id.* at 14-15. Ms. Patterson also read the following from the report she

prepared based on the evaluations she conducted:

> [Children] would have had the opportunity to develop a bond
> and attachment with [M]other prior to their foster placement in
> May 2013; however, their ability to form a bond and attachment
> with her would have been negatively impacted by the
> circumstances that were present during that time, including drug
> and/or alcohol abuse and mental health concerns.
> Subsequently, [M]other's difficulty in successfully participating in
> and completing recommended services over the past two years
> has also negatively impacted [Children's] ability to maintain any
> bond or attachment that they may have [] formed with her prior
> to their foster placement in May 2013. Additionally, [M]other's
> inability to have regular continuing contact with them during
> their foster placement has also been a deterrent in this regard.

*Id.* at 16. Ms. Patterson stated that Children have a "beginning bond" with

the foster parents. *Id.* at 21. Ms. Patterson stated that, in her professional

opinion, terminating Mother's parental rights would not negatively affect

Children. *Id.* at 15.

Anthony Berarducci, a caseworker for the Agency, provided testimony

at the termination hearing regarding Mother's failure to complete drug and

alcohol treatment successfully and comply with random drug and alcohol

screens, *id.* at 62-74; to comply with her mental health treatment, *id.* at

74-75; to obtain stable and appropriate housing, *id.* at 75-79, 81-82; and to

obtain and maintain employment.[3] *Id.* at 71, 83-84. In this regard, Mr.

---

[3] Chris King testified that she worked with Mother for about a year to a year
and a half as a family resource specialist with Justice Works Youth Care. *Id.*
at 36. She likewise provided testimony demonstrating that, during the time
in which she worked with Mother, Mother had difficulty caring for herself,

Berarducci testified that, since he was assigned the case in March 2013, Mother had 14 residences and was hospitalized 22 times. *Id.* at 76-77. Moreover, Mother only obtained one job in December 2014, which only lasted for about one week. *Id.* at 71, 83. Mr. Berarducci explained that he could not think of any harm to Children if Mother's rights were terminated and that termination would help Children proceed with their lives. *Id.* at 99-100.[4]

Based on the above, we conclude that the record supports the orphans' court's determination that Children's needs and welfare are best served by terminating Mother's parental rights. In so doing, we reject Mother's argument that termination is improper because Children have a minimal bond with her and no bond with the foster parents. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) ("The mere existence of an emotional bond does not preclude the termination of parental rights."); *In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) (concluding that termination was proper even though "Child loves Mother, … there was no evidence presented during the hearing that Child is bonded with his current foster family[, and] there was no testimony as to whether or not

---

could not maintain housing, was unable to maintain sobriety, and could not maintain employment. N.T., 7/2/2015, at 37-41, 43, 45-51, 53-56.

[4] Kathy Hager, the Court Appointed Special Advocate (CASA) worker for Children, also recommended termination of Mother's parental rights. N.T., 7/2/2015, at 105-06.

Child's current foster placement is pre-adoptive," reasoning that "these concerns are outweighed … by Mother's repeated failure to remedy her parental incapacity, and by Child's need for permanence and stability."); *In re Adoption of B.J.R.*, 579 A.2d 906, 915 (Pa. Super. 1990) ("Although the record offers no indication that CYS has found a prospective adoptive family for B.J.R., this fact does not serve to bar the involuntary termination of parental rights where such termination is otherwise warranted, inasmuch as 23 Pa.C.S. §2512(b) provides that an agency bringing a petition for involuntary termination 'shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.'").

Moreover, although there was testimony presented that Children should be placed together and B.M.G. was having difficulty deciding whether he wanted to be adopted, we observe that

> the preference of the child, reviewable in a custody proceeding, and his right to be heard on the record, is not relevant to termination proceedings, as the child is not electing a choice between two otherwise fit parents with whom he will be able to be placed. It is only when termination has been decreed and adoption pursued is the child's expression relevant to placement.

*In re B.L.L.*, 787 A.2d 1007, 1014 (Pa. Super. 2001).[5] Thus, Mother's arguments are without merit.

---

[5] In any event, testimony from the termination hearing showed that, over time, B.M.G. indicated a desire to be adopted. N.T., 7/2/2015, at 10, 15, 22, 28, 94-95, 107.

Accordingly, because the orphans' court properly terminated involuntarily Mother's parental rights to Children, we affirm the orders of the orphans' court.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 2/9/2016