J-S54029-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

IN RE: R.N.R.S., A MINOR : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
APPEAL OF: E.P.S., FATHER :
:
:
:
:
:
: No. 452 WDA 2017

Appeal from the Order March 9, 2017
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): TPR No. CP-02-AP--000134-2016

BEFORE: OTT, J., MOULTON, J., and FITZGERALD, J. *

MEMORANDUM BY MOULTON, J.: FILED SEPTEMBER 29, 2017

E.P.S. ("Father") appeals from the order dated March 8, 2017, entered

on March 9, 2017, involuntarily terminating his parental rights to his son,

R.N.R.S. ("Child"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2),

(5), (8), and (b).[1]  We affirm.

The relevant facts and procedural history of this case are as follows.

Mother and Father were not married.  Mother had a history with Allegheny

_____

* Former Justice specially assigned to the Superior Court.

[1] On March 8, 2017, the trial court terminated the parental rights of
Child's natural mother, A.J.R. ("Mother"), with respect to Child and his older
half-sister, A.M.R.-M. ("Half-Sister").  Mother did not contest the termination
of her rights to either child.  Mother is not a party to the current appeal, nor
did she file a separate appeal.  We note that the parental rights of Half-
Sister's biological father, D.R.-M., were also terminated on the same day.

County Office of Children, Youth and Families ("CYF") since before Child's birth. Mother was still a minor dependent in CYF placement when she gave birth to Child in December 2013. Child initially lived with Mother and Maternal Grandmother at Debra House, a shelter dependency placement for homeless women and their children. In July 2014, Debra House evicted Maternal Grandmother, which resulted in Mother losing her dependency placement. On July 23, 2014, when Child was seven months old, CYF obtained an Emergency Care Authorization ("ECA") and removed Child from Mother's care after she refused a different dependency placement and left Child in the alley near the CYF caseworker's car. On October 6, 2014, the trial court adjudicated Child dependent and placed him into foster care because Mother was a minor dependent without housing and CYF could not locate Father. On March 23, 2015, Child was returned to Mother. On July 31, 2015, the dependency case was closed.

On August 8, 2015, Maternal Grandmother took Child, who had marks all over his body, to the hospital. At this time, Father was living with Child, Mother, and Half-Sister, and was an active caregiver. Father and Mother claimed that the marks were bug bites and failed to return Child for follow-up treatment. The doctors determined that the marks on Child's body were infected cigarette burns, which raised safety and abuse concerns. On August 11, 2015, CYF obtained an ECA, removing Child and Half-Sister from Father's and Mother's care. On August 12, 2015, the trial court placed the

- 2 -

children into foster care with Project Star. The children have resided with the same pre-adoptive foster parents since their removal.

On December 14, 2015, Father stipulated to dependency, and the trial court adjudicated Child dependent. CYF created a Family Service Plan ("FSP") for the family. Father's FSP goals were: (1) to visit Child; (2) to cooperate with CYF in case planning, meetings, and court appointments; (3) to attend medical appointments for Child; (4) to participate in parenting classes with Arsenal Family and Children's Center; (5) to complete domestic violence counseling; and (6) to cooperate with ChildLine investigations.

On August 8, 2016, following an aggravated circumstances hearing, the trial court found Half-Sister credibly stated at a forensic interview that she witnessed Mother burn Child with a cigarette while Father laughed. The trial court determined that Child was a victim of physical abuse that resulted in serious bodily injury. The trial court directed that no efforts be made by CYF to reunify Child with Father or Mother. The trial court entered an order finding aggravated circumstances as to both Father and Mother, which resulted in a criminal investigation. In April 2016, Father was arrested and charged with causing Child's injuries. Father's visitations with Child were suspended. In December 2016, Father pled guilty to aggravated assault of a person under the age of 6, conspiracy to commit aggravated assault, endangering the welfare of children, recklessly endangering another person, and simple assault of a child. The trial court sentenced Father to two

consecutive terms of nineteen to thirty-eight months' incarceration followed by five years' probation, and barred him from having any contact with Child.[2]

On July 6, 2016, CYF filed petitions to involuntarily terminate Father's and Mother's parental rights to Child. With the trial court's permission, CYF filed amended petitions on December 6, 2016. On March 8, 2017, the trial court held a hearing on the petitions. At the hearing, CYF presented the testimony of Shelby Alston, a caseworker at CYF; Joshua Rowe, a foster care worker at Project Star; Eric Bernstein, Ph.D., a licensed psychologist; and Tina Sevin, a parenting coach at Arsenal Family and Children Center. Father, who was serving his sentence, was present in the courtroom with counsel and testified on his own behalf. That same day, the trial court entered an order terminating Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).

On March 21, 2017, Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Father raises the following issue for our review:

> 1. Whether the trial court abused its discretion and/or erred as a matter of law by determining that termination of Father's parental rights would meet the needs and welfare of Child under Section 2511(b), in spite of witness

---

[2] At the termination hearing, Father maintained he had sent a letter to his counsel informing counsel that he would like to withdraw his guilty plea. N.T., 3/8/17, at 127.

> testimony to the contrary showing a strong bond between
> Father and son.

Father's Br. at 7.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., 9 A.3d [1179,] 1190 [(Pa. 2010)].

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re M.G. & J.G., 855 A.2d 68, 73-74 (Pa.Super. 2004) (quoting In re Diaz, 669 A.2d 372, 375 (Pa.Super. 1995)). "[I]f competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result." In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa.Super. 2003) (quoting In re N.C., N.E.C., 763 A.2d 913, 917 (Pa.Super. 2000)).

Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, controls the termination of parental rights, and requires a bifurcated analysis, as follows:

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted). Our Supreme Court has defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." Matter of Adoption of Charles E.D.M. II, 708 A.2d 88, 91 (Pa. 1998) (quoting In re Adoption of Atencio, 650 A.2d 1064, 1066 (Pa. 1994)).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(2), (5), and (8), as well as (b). Father does not challenge the trial court's finding of grounds for termination under

- 6 -

section 2511(a). We, therefore, analyze the court's termination pursuant to section 2511(b).

Father argues that the trial court abused its discretion and/or erred in concluding that CYF met its burden of proving by clear and convincing evidence that termination of his parental rights best serves Child's needs and welfare under section 2511(b). Father's Br. at 11. Father claims that even though he did not visit Child as much as he wanted, witness testimony evidences his visits were positive and a strong bond between Father and Child exists. Id. at 11. Father contends that the trial court's finding that Child would be better off in a prospective adoptive home is not sufficient to terminate his parental rights. Id.

Section 2511(b) provides:

> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

With respect to section 2511(b), this Court has explained the requisite analysis as follows:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In In re C.M.S., 884 A.2d 1284, 1287 (Pa.Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. Id. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. In re K.Z.S., 946 A.2d 753, 762–63 (Pa.Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. Id. at [7]63.

In re I.E.P., 87 A.3d 340, 346 (Pa.Super. 2014) (quoting In re Adoption of J.M., 991 A.2d 321, 324 (Pa.Super. 2010)).

Additionally, the impact of a parent's abuse and neglect is a relevant part of this analysis:

[C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a de facto beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

In re K.K.R.-S., 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. See In re K.Z.S., 946 A.2d at 763-764 (affirming involuntary termination of mother's parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests, and any bond with mother would be fairly attenuated when child was separated from her, almost constantly, for four years).

Further, our Supreme Court stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." In re T.S.M., 71 A.3d at 268. The Supreme Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." Id. at 269. The Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." Id.

Here, in its Rule 1925(a) opinion, the trial court stated the following:

> In August 2016, the Court entered a finding of "aggravated circumstances," after concluding that [C]hild was a victim of physical abuse that resulted in serious bodily injury. The Court relieved CYF of making efforts toward reunification. Father was sentenced to two consecutive terms of 19-38 months of incarceration followed by five years of probation. Father had previously faced other criminal charges unrelated to [C]hild. Father's

visitation record post-placement is spotty. Although it is unclear precisely how many visits Father missed or was tardy to, it appears he only visited [C]hild about 17 out of 47 times.

Father has a history of domestic violence. Although he admitted to having physical altercations with Mother, not much more is known because neither parent was particularly forthcoming. Mother and Father are apparently still in a relationship. Father has demonstrated some good qualities. His interactions with [C]hild have been affectionate. He denies use of alcohol and any current or recent use of marijuana. Still, there is no doubt that termination would meet the needs and welfare of [C]hild.

The Court entertained the testimony and expert report of Dr. Eric Bernstein, who conducted evaluations of Father, [C]hild, and foster parents. Dr. Bernstein testified that when Father entered late the interactional evaluation between the parents and the children, Father "essentially dismissed Mother and assumed control and ownership" of the children's time. Dr. Bernstein said that Father's action is "not in and of itself representative of him abusing anyone, but the fact that she withdrew and he essentially overtook the time with the children, I think, is a noteworthy factor." Regarding their co-parenting relationship, Dr. Bernstein said he developed concerns about the parents' "interaction and lack of communication and show of consideration for each parent's role in the children's respective lives."

At the time of the evaluations in 2016, Dr. Bernstein was not posed with the question of whether termination would best serve [C]hild's needs and welfare. Naturally, he was ignorant of the parents' subsequent guilty plea relating to the charges they received for harming [C]hild. Presented with this information on direct examination, Dr. Bernstein testified that "if the children or child is deemed to be unsafe in the parents' care and that the child has been victim to mistreatment by the parent in question, then that certainly would be a persuasive if not strong consideration when evaluating the termination of parental rights." He testified that safety is one of, if not the most

- 10 -

paramount factor when evaluating the needs and welfare of [C]hild.

He further testified that he did not draw the conclusion that a relationship between Father and [C]hild is necessary and beneficial to [C]hild. Conversely, he testified that the foster parents are providing safety and security to [C]hild. The [C]hild refers to the foster parents as his parents. Dr. Bernstein testified that [C]hild is well bonded to the foster parents and that the foster parents are meeting [C]hild's needs.

CONCLUSION

Father does not deny that CYF has proven three independent grounds for terminating his rights. He merely appeals this Court's determination that termination would best serve [C]hild's needs and welfare. The Court has no doubt that its conclusion is correct. It is clear that a relationship between Father and [C]hild is not necessary or beneficial. It is clear that [C]hild is not safe with Father. It is clear that the foster parents provide security for [C]hild and that [C]hild is bonded to them. CYF has carried the burden of proving by clear and convincing evidence that Father's parental rights should be terminated and that [C]hild's best interests would be served thereby. For these reasons, the decision of this Court should be affirmed.

Trial Ct. Op., 5/10/17, at 5-7 (citations to record omitted).

We conclude that the record supports the trial court's factual findings. See In re Adoption of S.P., 47 A.3d at 826-27. Further, based on our thorough review of the record, we discern no abuse of discretion or legal error by the trial court in concluding that termination of Father's parental rights would best serve Child's needs and welfare. The trial court thoroughly considered Child's bond with Father and the effect of severing that bond. To the extent that Father and Child are bonded, that bond is clearly outweighed

in the instant case by Child's need for safety, and by the strong parent-child bond that Child shares with his foster parents.

Because we conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights pursuant to section 2511(b), we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/29/2017